# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*Innovative Garage Door Co. v. High Ranking Domains, LLC*, 2012 IL App (2d) 120117

---

| | |
|---|---|
| Appellate Court Caption | INNOVATIVE GARAGE DOOR COMPANY, Plaintiff-Appellant, v. HIGH RANKING DOMAINS, LLC, Defendant-Appellee. |
| District & No. | Second District<br>Docket No. 2-12-0117 |
| Filed | December 3, 2012 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A Colorado Internet business that contracted to sell leads for garage-door services to providers of such services, including plaintiff, an Illinois business engaged in installing and repairing garage doors, was subject to personal jurisdiction in the breach of contract action plaintiff filed when defendant terminated its contract to supply leads to plaintiff and started selling leads to another company, since defendant had sufficient minimum contacts with Illinois and requiring defendant to litigate the matter in Illinois would not offend traditional notions of fairness and substantial justice. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 11-L-225; the Hon. Kenneth L. Popejoy, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on Appeal

Michael A. Cotteleer, of Young & Cotteleer, of Wheaton, for appellant.

Timothy A. Armstrong and Kenneth M. Mastny, both of Berglund, Armstrong & Mastny, P.C., of Oak Brook, for appellee.

Panel

JUSTICE HUDSON delivered the judgment of the court, with opinion.

Justices Zenoff and Burke concurred in the judgment and opinion.

## OPINION

¶ 1      In this breach-of-contract case, plaintiff, Innovative Garage Door Company (Innovative), appeals the trial court's order dismissing its complaint against defendant, High Ranking Domains, LLC (HRD), for lack of personal jurisdiction. At issue is whether HRD's activities are sufficient to establish jurisdiction over it. We conclude that they are. Accordingly, we reverse and remand for further proceedings.

¶ 2                            I. BACKGROUND

¶ 3      Innovative is an Illinois corporation that repairs and installs garage doors. HRD is an Arizona limited liability company with its principal place of business in Colorado. HRD owns at least three websites, including garagedoorsofamerica.com, designed to solicit inquiries from people seeking handyman, plumbing, or garage-door services. HRD then sells these leads to companies throughout the United States.

¶ 4      When the website garagedoorsofamerica.com is viewed,[1] a form allows users to seek services in specific states and cities. Illinois is listed in various locations as a supported state. Separate text links allow users to seek services in specific states, including Illinois. A person using the website can use pull-down menus to choose a specific city in Illinois and select a desired service in order to seek an estimate. The website then identifies a company that serves the area, provides a local telephone number to call for a free estimate, and lists coupon codes. HRD does not have offices in Illinois, and its employees do not regularly travel to Illinois or physically conduct business in this state.

---

[1] Information about the content of HRD's websites was not included in the pleadings. However, the domain locations were included. We determine that it is appropriate to take judicial notice of the material that appears on those sites. See *Publications International, Ltd. v. Burke/Triolo, Inc.*, 121 F. Supp. 2d 1178, 1182 n.2 (N.D. Ill. 2000). Regardless, while the content of the websites bolsters our decision in this case, we would reach the same determination in this matter had we not taken judicial notice, as the pleadings sufficiently detail that HRD uses commercial websites to obtain leads from Illinois residents.

¶ 5    In 2007, the president of Innovative saw an advertisement placed by HRD in International Door and Opener Magazine that invited garage-door installers across the country to enter into a contract to obtain installation and repair leads. Innovative became one of HRD's customers by downloading a written service agreement from HRD's website at highrankingdomains.com, which it submitted to HRD by mail or fax. HRD accepted the contract in Arizona. The highrankingdomains.com website states that HRD is an Internet lead-generation company that specializes in search-engine marketing. All indications from the website are that HRD does most, if not all, of its business online.

¶ 6    Under the agreement, HRD sold approximately 150 leads per year to Innovative for $15 each. The leads were compiled by HRD, concerned garage-door services in Illinois, and were for cities in Illinois that Innovative chose from an online selection. HRD transmitted the leads from Arizona to Innovative in Illinois, and Innovative paid for the leads using its Illinois credit-card account. How the leads were transmitted is unknown. The contract allowed for transmittal by telephone or e-mail, and the copy in the record does not indicate how leads were actually transmitted. Billing took place from Arizona and charges were made based on a credit-card authorization form that was sent to HRD in Arizona when the agreement was sent.

¶ 7    In November 2010, HRD terminated the agreement in order to sell the leads to another company. Innovative then filed a complaint seeking damages for breach of contract, contending that a clause in the contract required HRD to continue services indefinitely, with Innovative being the only party who could cancel the contract. HRD moved to dismiss the complaint, contending that the trial court lacked personal jurisdiction over it.

¶ 8    The trial court determined that, because there were no HRD offices in Illinois, no travel to Illinois, and no maintenance of business activities in Illinois, it lacked personal jurisdiction over HRD. The court found HRD's Internet activity akin to an advertisement and concluded that HRD was merely a conduit for connecting consumers with service providers. The court stated that HRD's activities were not sufficient to subject it to jurisdiction in every state where it brought together two in-state parties. Thus, the court dismissed the complaint. Innovative now appeals.

¶ 9                                    II. ANALYSIS

¶ 10   Innovative contends that the trial court erred in dismissing the case, arguing that HRD was subject to the lawsuit in Illinois because it collected information from Illinois residents via its Internet business and sold that information to Innovative in Illinois. HRD contends that subjecting it to suit in Illinois would violate due process (HRD mentions the Illinois long-arm statute (735 ILCS 5/2-209 (West 2010)) in its brief; however, the parties' arguments largely focus on federal due process principles).

¶ 11   " 'The plaintiff has the burden of proving a *prima facie* case for jurisdiction when seeking jurisdiction over a nonresident defendant.' " *Wiggen v. Wiggen*, 2011 IL App (2d) 100982, ¶ 20 (quoting *Bolger v. Nautica International, Inc.*, 369 Ill. App. 3d 947, 949 (2007)). "When the trial court decides the issue of personal jurisdiction based solely on documentary evidence, our review is *de novo*." *Id.* " 'In reviewing affidavits and pleadings,

we resolve conflicts between the documents in the plaintiff's favor for purposes of determining whether a *prima facie* case for jurisdiction has been shown.' " *Id.* (quoting *Bolger*, 369 Ill. App. 3d at 950). " 'A plaintiff's *prima facie* case for jurisdiction can be overcome by a defendant's uncontradicted evidence that defeats jurisdiction.' " *Id.* (quoting *Bolger*, 369 Ill. App. 3d at 950).

¶ 12        Section 2-209(c) of the Code of Civil Procedure (the long-arm statute) allows an Illinois court to exercise personal jurisdiction on any basis permitted by the Illinois Constitution and the Constitution of the United States. 735 ILCS 5/2-209(c) (West 2010). " 'Thus, the long-arm statute has been held to be coextensive with the due process requirements of the Illinois and United States Constitutions.' " *Wiggen*, 2011 IL App (2d) 100982, ¶ 21 (quoting *Bolger*, 369 Ill. App. 3d at 950). Accordingly, the issue is addressed according to due-process requirements. *Id.*

¶ 13        "Under state due process guarantees, it must be fair, just, and reasonable to require a nonresident to defend an action in Illinois, considering the quality and nature of the defendant's acts that occur in Illinois or that affect interests located in Illinois." *Id.* ¶ 22. The federal due process analysis considers whether " '(1) the nonresident defendant had "minimum contacts" with the forum state such that there was "fair warning" that the nonresident defendant may be haled into court there; (2) the action arose out of or related to the defendant's contacts with the forum state; and (3) it is reasonable to require the defendant to litigate in the forum state.' " *Bolger*, 369 Ill. App. 3d at 950 (quoting *Keller v. Henderson*, 359 Ill. App. 3d 605, 613 (2005))[2]; see also *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-77 (1985). Moreover, personal jurisdiction is not a contest between two states, with the winner being able to assert jurisdiction. *Viktron Ltd. Partnership v. Program Data Inc.*, 326 Ill. App. 3d 111, 118-19 (2001). Thus, conduct by a party that might allow another state to exercise jurisdiction is not relevant to assessing whether Illinois may assert it as well. *Id.* at 119.

¶ 14        At issue in this appeal is whether HRD had sufficient minimum contacts with Illinois so that Illinois courts can assert personal jurisdiction over it. "The minimum contacts required for the exercise of personal jurisdiction differ depending on whether general jurisdiction or specific jurisdiction is being sought." *Wiggen*, 2011 IL App (2d) 100982, ¶ 24 (citing *Bolger*, 369 Ill. App. 3d at 951). The present case arises out of HRD's relationship with Innovative; hence, we limit our inquiry to the question of specific jurisdiction and express no opinion on the subject of general jurisdiction. " 'A court has specific jurisdiction over a defendant if the suit arises out of or relates to the defendant's contacts with the forum state.' " *Wiggen*, 2011 IL App (2d) 100982, ¶ 29 (quoting *Bolger*, 369 Ill. App. 3d at 952). "For specific jurisdiction, the suit must arise directly out of the contacts between the defendant and the

---

[2]In *Keller*, 359 Ill. App. 3d at 620, we noted that "in almost all cases, when federal due process concerns regarding personal jurisdiction are satisfied, so are Illinois due process concerns." Thus, as there was no contention that the analyses diverged, we held that "because federal due process concerns have been satisfied in this case, so have Illinois due process concerns." *Id.* Similarly, neither party in this case asserts that the analyses diverge. Thus, we address only the federal due process standard.

forum." *Id.*

¶ 15                               A. Minimum Contacts

¶ 16     " 'In order for personal jurisdiction to comport with federal due process requirements, the defendant must have certain minimum contacts with the forum state such that maintaining the suit there does not offend traditional notions of fair play and substantial justice.' " *Wiggen*, 2011 IL App (2d) 100982, ¶ 24 (quoting *Bolger*, 369 Ill. App. 3d at 951). "At a minimum, the court must find an act by which the defendant purposefully avails him or herself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Id.* ¶ 29. "The focus is on the defendant's activities within the forum State, not on those of the plaintiff." (Internal quotation marks omitted.) *Id.* "The purposeful-availment requirement exists so that an out-of-state defendant will not be forced to litigate in a distant or inconvenient forum solely as a result of random, fortuitous, or attenuated contacts or the unilateral act of a consumer or some other third person." *Id.* ¶ 24. This connection does not require physical contacts with the forum state. Rather, "[s]o long as a commercial actor's efforts are 'purposefully directed' toward residents of another State," that state may exercise personal jurisdiction over a nonresident defendant. *Burger King*, 471 U.S. at 476 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774-75 (1984)). Once a plaintiff has established a defendant's minimum contacts with Illinois, we must then consider those contacts in light of certain other factors to determine whether the exercise of personal jurisdiction comports with " 'fair play and substantial justice.' " *Id.* (quoting *International Shoe Co. v. State of Washington, Office of Unemployment Compensation & Placement*, 326 U.S. 310, 320 (1945)).

¶ 17                            B. Implications of the Internet

¶ 18     An additional consideration is relevant to our analysis, namely, HRD's website. "The type of Internet activity sufficient to establish personal jurisdiction is a developing area of jurisprudence ***." *Larochelle v. Allamian*, 361 Ill. App. 3d 217, 225 (2005). Two major lines of jurisprudence grapple with the phenomenon that is the Internet. An early attempt to deal with this subject occurred in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997). There, the federal district court from the Western District of Pennsylvania crafted a "sliding scale" test based upon the relative interactivity and the commercial nature of a website. *Zippo*, 952 F. Supp. at 1123-24. A second line of cases concerns the degree to which a foreign party has "targeted" the forum state. See, *e.g.*, *ALS Scan, Inc. v. Digital Service Consultants, Inc.*, 293 F.3d 707, 714 (4th Cir. 2002) ("This standard for reconciling contacts through electronic media with standard due process principles is not dissimilar to that applied by the Supreme Court in *Calder v. Jones*, [465 U.S. 783 (1984)]. In *Calder*, the Court held that a California court could constitutionally exercise personal jurisdiction over a Florida citizen whose only material contact with California was to write a libelous story in Florida, directed at a California citizen, for a publication circulated in California, knowing that the 'injury would be felt by [the Californian] in the State in which she lives and works.' *Id.* at 789-90. Analogously, under

the standard we adopt and apply today, specific jurisdiction in the Internet context may be based only on an out-of-state person's Internet activity directed at Maryland and causing injury that gives rise to a potential claim cognizable in Maryland."). These cases give us additional tools to apply when confronted with a jurisdictional question involving the Internet.

¶ 19 We emphasize, however, that they are just tools that may be useful in analyzing certain fact patterns. Neither line of cases should be regarded as providing a dispositive test to be applied in cases involving jurisdiction and the Internet. Indeed, doing so would be inconsistent with the Supreme Court's rejection in *Burger King*, 471 U.S. at 478 (quoting *International Shoe Co.*, 326 U.S. at 316), of "the notion that personal jurisdiction might turn on 'mechanical' tests." Essentially, the analyses contained in these cases are relevant only to the extent that they shed light upon a jurisdictional issue.

¶ 20 Notably, though the *Zippo* test has been widely applied by federal trial courts, including those in the Seventh Circuit (see, *e.g.*, *Berthold Types Ltd. v. European Mikrograf Corp.*, 102 F. Supp. 2d 928, 932-33 (N.D. Ill. 2000)), the Seventh Circuit expressly declined to fashion a special jurisdictional test for Internet cases (*Illinois v. Hemi Group LLC*, 622 F.3d 754, 758-59 (7th Cir. 2010) (citing *Tamburo v. Dworkin*, 601 F.3d 693, 703 n.7 (7th Cir. 2010))). That court explained:

> "*Zippo*'s sliding scale was always just short-hand for determining whether a defendant had established sufficient minimum contacts with a forum to justify exercising personal jurisdiction over him in the forum state. But we think that the traditional due process inquiry described earlier is not so difficult to apply to cases involving Internet contacts that courts need some sort of easier-to-apply categorical test." *Id.* at 759.

We agree that a specific test for Internet cases is unwarranted. Instead, we view the *Zippo* test as a guiding factor. Hence, though we have previously approved of the *Zippo* test, we now clarify that it is not to be treated as the ultimate test for determining jurisdiction in Internet cases. Instead, the ultimate analysis is what it has always been–whether the quality and nature of the defendant's contacts with the forum are such that it is fair and reasonable to assert personal jurisdiction. In light of the Supreme Court's demand that jurisdiction be analyzed in a " 'highly realistic' " manner, courts must be cautious in applying any seemingly categorical tests to questions of jurisdiction, whether Internet-related or not. *Burger King*, 471 U.S. at 478 (quoting *International Shoe Co.*, 326 U.S. at 316).

¶ 21 Having placed these tests in a proper context, we now turn to their substance. Under the *Zippo* analysis, at the top of the scale, "jurisdiction attaches to a nonresident defendant where it transacts business in foreign jurisdictions via an interactive website where contracts are completed online and the defendant derives profit directly from web-related activity." *Larochelle*, 361 Ill. App. 3d at 225 (citing *Bombliss v. Cornelsen*, 355 Ill. App. 3d 1107, 1114 (2005)). Generally, the mere maintenance of an interactive website is not enough. Rather, at the top end of the scale, jurisdiction is proper over "businesses which conduct a significant portion of their business though ongoing Internet relationships; for example, by entering 'into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet.' " *Millennium Enterprises, Inc. v.*

*Millennium Music, LP*, 33 F. Supp. 2d 907, 920 (D. Or. 1999) (quoting *Zippo*, 952 F. Supp. at 1124). Conversely, at the bottom of the scale, "jurisdiction does not attach where the nonresident maintains a passive website that merely provides information about the defendant's products or services." *Larochelle*, 361 Ill. App. 3d at 225. "In between lies a third type of website that is interactive in that it allows customers in foreign jurisdictions to communicate regarding the defendant's products and services; such a website may or may not be sufficient to assert personal jurisdiction, depending on the level of interactivity and the commercial nature of the information exchanged." *Id.* "Ultimately, whether a state may exercise personal jurisdiction is determined by 'examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.' " *Berthold*, 102 F. Supp. 2d at 932 (quoting *Zippo*, 952 F. Supp. at 1124). The quality and nature of commercial activity that an entity conducts over the Internet is a key consideration. See *id*. We note, however, that cases where the maintenance of a website is asserted as the sole basis for personal jurisdiction are probably rare and more often, additional considerations independent of the Internet (such as a contract and the parties' obligations under it) will bear upon the issue as well. *E.g.*, *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 453 (3d Cir. 2003) ("In deciding whether to exercise jurisdiction over a cause of action arising from a defendant's operation of a web site, a court may consider the defendant's related non-Internet activities as part of the 'purposeful availment' calculus.").

¶ 22    Here, we are not presented with a situation where jurisdiction is entirely dependent on the existence of a website. In deciding that Illinois may assert jurisdiction over HRD, we are guided by considerations beyond the interactivity of the website. Generally, regardless of the interactivity of the website,"something more" than just the presence of a website is required. See *Millennium Enterprises, Inc.*, 33 F. Supp. 2d at 919 (citing *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 418 (9th Cir. 1997)). Thus, we have held that the sale of a product over an Internet auction site to a buyer in Illinois, when the seller has no control over who purchases the item, does not subject the seller to jurisdiction in Illinois without further ties to the state. *MacNeil v. Trambert*, 401 Ill. App. 3d 1077, 1082-83 (2010). We also agree that the quality and nature of commercial activity that an entity conducts over the Internet is a key consideration. See *Berthold*, 102 F. Supp. 2d at 932. But, while a highly interactive website might indicate the quality of commercial contacts with the forum, it is the contacts themselves that would allow us to exercise jurisdiction rather than the mere fact that the website is interactive.

¶ 23    Moreover, when assessing Internet-based contacts, it is also important to consider the extent to which an entity outside the forum directed its activities at the forum state. In *Burger King*, 471 U.S. at 472, the Supreme Court held that specific personal jurisdiction exists where a defendant has "purposefully directed" his or her activities at the forum state and the claimed injuries arise out of those activities. The Seventh Circuit, discussing *Calder*, 465 U.S. 783, explained that conduct is purposefully directed at a state where (1) the conduct at issue is intentional; (2) it is expressly aimed at the forum state; and (3) the defendant is aware that its effects will be felt in the forum state. *Tamburo*, 601 F.3d at 702-03. We note that *Calder* has generally been applied only in tort cases. See, *e.g.*, *Revell v. Lidov*, 317 F.3d 467 (5th Cir. 2002). However, drawing distinctions between tort and contract cases for the

purpose of assessing personal jurisdiction is of questionable utility. *Planning Group of Scottsdale, L.L.C. v. Lake Mathews Mineral Properties, Ltd.*, 246 P.3d 343, 349 (Ariz. 2011) (*en banc*) ("Moreover, we do not believe that if purposeful direction is established with respect to a tort claim, a contract claim arising out of precisely the same set of facts is somehow placed beyond the constitutional purview of Arizona courts. The issue, after all, is whether the aggregate of the defendants' contacts with this state makes it fair and reasonable to hale them into court here with respect to claims arising out of those contacts."); see also Sasha Meschkow, *Unifying Personal Jurisdiction In The Ninth Circuit*, 43 Ariz. St. L.J. 1345, 1361 (2011) ("[T]here is nothing in the Calder opinion to suggest the effects analysis could not be applied in non-tort cases where the actions are intentional, expressly aimed towards the forum, and cause harm to the plaintiff in the forum."). In fact, the Supreme Court itself has relied on *Calder* in a contract case. *Burger King*, 471 U.S. at 469 n.11, 476. Thus, to the extent that the *Calder* framework is helpful in analyzing any given case, we will apply it.

¶ 24                    C. Specific Personal Jurisdiction

¶ 25     Having set forth the applicable law, we will now turn to the question of whether specific personal jurisdiction exists with respect to HRD. We conclude that it does. Initially, we note that we are not called upon to consider whether HRD's website alone provides a basis for Illinois to exercise jurisdiction in this matter. Quite simply, this is not a case in which a defendant's only tie to the forum state is its website. The most significant contact HRD has with this state is the nature of its business relationship with Innovative. HRD entered into a contract that established a long-term–indeed, as alleged, open-ended–relationship with an Illinois business. Pursuant to that relationship, HRD arranged business transactions between the Illinois business and what were primarily Illinois consumers (we recognize that some of the contacts may have been to residents of other states–for example, nonresidents who own property in Illinois–however, given the location-oriented nature of HRD's website, the vast majority of contacts were surely with residents of Illinois). In *Burger King*, 471 U.S. at 478-79, the Supreme Court explained:

> "The Court long ago rejected the notion that personal jurisdiction might turn on 'mechanical' tests, [citation], or on 'conceptualistic . . . theories of the place of contracting or of performance,' [citation]. Instead, we have emphasized the need for a 'highly realistic' approach that recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.' [Citation.] It is these factors–prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing–that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum."

Here, the substance of the agreement clearly establishes a significant relationship between HRD and Illinois. HRD's contacts with Illinois are in no way "random, fortuitous, or attenuated" (*Wiggen*, 2011 IL App (2d) 100982, ¶ 24); rather, they arise from substantial

obligations in this state to which HRD voluntarily subjected itself by entering into a contract with an Illinois resident.

¶ 26    In order to provide garage-door customer contacts to Innovative, HRD maintained a website. While the website is commercial, it is only minimally interactive. It merely allows a user to select a state and city, to which the website responds by identifying a local contractor. *Cf. Larochelle*, 361 Ill. App. 3d at 225 (holding that a website whose only interactive feature was to allow users to retrieve stock quotes was "barely more than passive"). However, the website was unquestionably directed (in relevant part) at Illinois. In *Hemi Group*, 622 F.3d at 758, the Seventh Circuit observed that a website that specifically identified a state–indicating a willingness to do business with the state's residents–would provide an indication that the operator of the website was purposefully availing itself of the protection of the state's laws. In this case, HRD did expressly identify Illinois on its website and also listed a number of cities within this state. HRD bills itself as an Internet company that specializes in search marketing, and its website specifically invites Illinois residents to fill out forms seeking information. Without the Internet, and without users in Illinois accessing HRD's website from Illinois, performance of the contract would be impossible under HRD's business model. Hence, HRD's website was expressly directed toward Illinois residents. Again, there is nothing "random, fortuitous, or attenuated" (*Wiggen*, 2011 IL App (2d) 100982, ¶ 24) about this contact, in that it reflects HRD's deliberate decision to include Illinois on its website. Thus, though the website is not particularly interactive, that it is commercial and directed toward Illinois militate in favor of finding personal jurisdiction over HRD for the purpose of this action.

¶ 27    We need not decide whether HRD's website would, in itself, be a sufficient basis to assert personal jurisdiction in this case. Instead, we consider the website in aggregate with the contractual relationship into which HRD entered. The substantial and ongoing nature of this relationship is also noteworthy–HRD provided Innovative with approximately 150 leads per year for about 3½ years. We hold that HRD's maintenance of a commercial website directed at this state, which is related to the subject matter of this litigation, in addition to its entering into a contract to provide an Illinois business with leads to predominantly Illinois customers, is a sufficient basis for specific personal jurisdiction in this case.

¶ 28    HRD counters that Innovative can meet none of the following factors, which it asserts are pertinent here: (1) who initiated the transaction; (2) where the contract was formed; and (3) where performance was to take place. See *Bolger*, 369 Ill. App. 3d at 952. We note that the first two factors seem inconsistent with the Supreme Court's admonishment that it had "long ago rejected the notion that personal jurisdiction might turn on 'mechanical' tests, [citation], or on 'conceptualistic . . . theories of the place of contracting or of performance, [citation].' " *Burger King*, 471 U.S. at 478-79. This apparent conflict between Illinois and Supreme Court precedent is entirely explicable. These factors are taken from *Viktron*, 326 Ill. App. 3d at 117, and *Ideal Insurance Agency, Inc. v. Shipyard Marine, Inc.*, 213 Ill. App. 3d 675, 680 (1991), both of which apply them in analyzing jurisdiction under the Illinois long-arm statute (735 ILCS 5/2-209 (West 2010)). They are therefore not applicable to a due process analysis. See *Madison Miracle Productions, LLC v. MGM Distribution Co.*, 2012 IL App (1st) 112334, ¶¶ 59-62. Furthermore, we note that these factors have been applied to

subsections 2-209(a)(1) and 2-209(a)(7) of the long-arm statute (735 ILCS 5/2-209(a)(1), (a)(7) (West 2010)). Subsection 2-209(c) allows an Illinois court to exercise jurisdiction on any basis permitted by the federal constitution. 735 ILCS 5/2-209(c) (West 2010). Thus, so long as federal due process requirements are met, there is no need to consider whether the application of the factors upon which HRD relies would allow an assertion of jurisdiction under an additional portion of the long-arm statute.

¶ 29    The third factor–where the parties contemplated that performance would take place–is consistent with federal due process principles. See *Burger King*, 471 U.S. at 479 ("It is these factors–prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing–that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum."). HRD claims "it is easy to establish that [it] did *not* perform any part of the contract in Illinois," because it "was never in Illinois, and at most merely transmitted information from Arizona to Innovative via electronic means." (Emphasis in original.) Initially, we note that it is not the place where performance occurred that is relevant; it is the place where performance was contemplated. *Viktron*, 326 Ill. App. 3d at 119. Furthermore, HRD's reliance on the fact that it never entered Illinois is completely misplaced, for the Supreme Court has held that "[s]o long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, [it has] consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Burger King*, 471 U.S. at 476. Moreover, HRD mischaracterizes the nature of its business; it was not operating an online telephone book. Illinois consumers seeking a garage-door contractor were not simply given a list of all contractors in the area. HRD paired consumers with contractors based on geography, and it (allegedly) had a contractual commitment to provide those contacts to a particular contractor–in this case, Innovative–within a geographical area. Put differently, it was not simply disbursing information to consumers; it was directing them to a particular Illinois company, based on the company's willingness to pay a referral fee to HRD, thereby facilitating business transactions within this state that might not have otherwise occurred. Given such circumstances, we disagree with HRD that it was simply sending information into the state.

¶ 30    Sound guidance for the resolution of this appeal can be found in *Hemi Group*, where the Seventh Circuit, without applying the *Zippo* test, found that jurisdiction could be asserted over a defendant who made sales to Illinois through a commercial and interactive website that had features indicating the defendant's desire to avail itself of doing business in Illinois. That website allowed customers to create accounts and calculate shipping based on their location. The website also specifically excluded New York from its shipping locations because of ongoing litigation there. The court observed that, "[a]lthough listing all forty-nine states by name would have made a stronger case for jurisdiction," by excluding New York the defendant had expressly elected to do business with residents of the forty-nine other states. *Hemi Group*, 622 F.3d at 758. It also showed that the defendant knew that conducting business with a particular state could subject it to jurisdiction there. Ultimately, the court concluded that the exercise of jurisdiction was appropriate, finding that, by creating several commercial, interactive websites through which customers could purchase cigarettes, after which the defendant physically shipped the products to Illinois, the defendant held itself out

as open to doing business with Illinois and reached out to residents of Illinois as opposed to the residents unilaterally reaching back. *Id.* As in *Hemi Group*, HRD operated a commercial website that contained indications of a desire to do business with Illinois residents. While the defendant in *Hemi Group* shipped products into the state, HRD transmitted information into Illinois that served to facilitate business transactions between Illinois residents and Illinois businesses (more precisely, as we are considering specific jurisdiction, between residents of this state and Innovative, an Illinois company that is involved in this litigation). We recognize that the website in *Hemi Group* was more interactive; however, we find this insufficient to distinguish that case, particularly in light of the fact that HRD entered into a long-term agreement with a resident of this state while the defendant in *Hemi Group* was engaged in individual sales of goods.

¶ 31 We also find instructive the reasoning in *GTE New Media Services Inc. v. Ameritech Corp.*, 21 F. Supp. 2d 27, 38-39 (D.D.C. 1998), *rev'd*, *GTE New Media Services Inc. v. BellSouth Corp.*, 199 F.3d 1343 (D.C. Cir. 2000). There, the foreign defendants operated an Internet yellow-pages directory service that actively sought the exchange of information with users. On the website, users could provide information and then be directed to the service they were seeking. The trial court determined that the defendants derived profit from advertisements on the website when users in the forum state viewed the site. In finding that personal jurisdiction was proper, the court specifically noted that "the non-resident defendant controls the means by which it seeks to economically benefit from the forum." *Id.* at 39. Thus, the court found that the quality and nature of the contacts, which secured a significant commercial benefit from forum users through interaction with the website, resulted in sufficient contacts to support the exercise of personal jurisdiction. *Id.*; see also *Bombliss*, 355 Ill. App. 3d at 1114-15 (maintenance of interactive commercial website with interactive chat rooms, combined with initiation of contract negotiations by defendant, sufficient to confer jurisdiction); *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1265 (6th Cir. 1996) (jurisdiction established, partly in light of ongoing Internet-based relationship); *Edvisors Network, Inc. v. Educational Advisors, Inc.*, 755 F. Supp. 2d 272, 283 (D. Mass. 2010) (finding specific jurisdiction in part because the defendant had marketed its services to residents of the state through the use of an interactive website in an effort to provide services to residents of the forum). *GTE* was reversed on appeal, in part because the appellate court took issue with the trial court's findings of fact concerning profit derived from advertising. *GTE New Media Services Inc. v. BellSouth Corp.*, 199 F.3d at 1349. We note that we too might not have found jurisdiction proper in *GTE*, given that the profit derived appeared to come from users viewing advertising rather than more interactive contact. However, we find persuasive the trial court's remarks concerning the commercial nature of the website and the defendant's ability to control the means by which it profited from the forum. The same can be said here of HRD–it makes $15 every time an Illinois resident uses its website to locate an Illinois contractor to perform services in Illinois.

¶ 32 In sum, we find that specific personal jurisdiction over HRD is proper. HRD entered into an open-ended contract to provide leads from Illinois customers to an Illinois company. Moreover, the quality and nature of HRD's contacts with this state through its website also support an assertion of jurisdiction. Unlike a case where a company operates an informative

website or where a seller puts an item up for sale on the Internet and does not know where it will be purchased, HRD's website caters to residents of specific localities in order to exchange commercial information. HRD can derive profit only when a consumer in one of those localities uses its services and HRD then provides the information to a business in the same location. Thus, its ability to do business is specifically location-oriented. Illinois is one such location. Although HRD has no physical contacts with Illinois and the contract was not formed here, the facts that HRD runs an interactive, commercial website designed to generate leads from Illinois residents and that the website is specifically tied to a long-standing contract with an Illinois resident constitutes conduct purposefully directed toward this state. Thus, the quality and nature of those contacts are sufficient to overcome the lack of physical contacts with the state and are the minimum contacts necessary to allow courts in Illinois to assert personal jurisdiction over HRD.

¶ 33           D. Fair Play and Substantial Justice

¶ 34   Having determined that HRD established sufficient minimum contacts in Illinois, we must next decide if requiring it to litigate in Illinois would offend traditional notions of " 'fair play and substantial justice.' " *Burger King*, 471 U.S. at 476 (quoting *International Shoe*, 326 U.S. at 320). "A court may evaluate the burden on the defendant to litigate in the forum, the forum's interest in adjudicating the dispute, the plaintiff's interest in convenient and effective relief, and the interstate judicial system's interest in the most efficient resolution of a controversy." *Aasonn, LLC v. Delaney*, 2011 IL App (2d) 101125, ¶ 25. "A defendant who purposefully directed his activities at a forum must present a compelling case to defeat jurisdiction." *Id.*

¶ 35   Here, although HRD argues that it did not have sufficient minimum contacts with Illinois, it does not argue that jurisdiction is defeated based on traditional notions of fair play and substantial justice. Illinois has an interest in providing a means of redress for its injured resident. See *id.* ¶ 26. Further, having sought the benefit of a nationwide business model, it is fair that HRD also expect the legal exposure that comes with it. See *Hemi Group*, 622 F.3d at 760. Given that HRD has not provided information to defeat jurisdiction on this basis, there is no reason to conclude that requiring it to litigate in Illinois would offend traditional notions of fair play and substantial justice.

¶ 36             III. CONCLUSION

¶ 37   Because of its high level of location-oriented Internet activity that involved the exchange of commercial information and the ongoing contractual commitment it made to arrange business transactions between entities in this state, HRD established a substantial connection with Illinois. Thus, there were sufficient minimum contacts with Illinois for the exercise of personal jurisdiction. Doing so offends no notions of fairness or substantial justice. Accordingly, the judgment of the circuit court of Du Page County is reversed and this cause is remanded for further proceedings.

¶ 38   Reversed and remanded.